# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

MELANIE MADDEX,                    :

          Plaintiff,              :

                           Case No. 3:10CV159

  vs.                                :

                           District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                 :    Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,        :

          Defendant.              :

## REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

Plaintiff Melanie Maddex sought financial assistance from the Social

Security Administration by applying for Supplemental Security Income ["SSI"]

and Disability Insurance Benefits ["DIB"] in March 2005, alleging disability since

October 5, 2003.[2]  (Tr. 85-89, 822-24).  Although Plaintiff originally claimed to be

disabled by back problems, depression, bi-polar disorder and insomnia (Tr. 101),

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

[2]Plaintiff filed her initial application for DIB in December 2003, alleging disability since
October 5, 2003.  (Tr. 82-84).  That claim was denied initially and on reconsideration.  (Tr. 44-52).

she later testified and now maintains in this Court that her history of a kidney infection (Tr. 839), fibromyalgia (Tr. 842), asthma (Tr. 845), headaches (Tr. 846), stomach problems (*id.*),  constipation (Tr. 848), knee problems (Tr. 864, 867) and tingling in her hands (Tr. 865-66) also impede her ability to work.

   After various administrative proceedings, Administrative Law Judge ["ALJ"] Thomas R. McNichols II denied Plaintiff's SSI and DIB applications based on his conclusion that Plaintiff's impairments do not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 18-32).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

   This case is before the Court upon Plaintiff's Statement of Errors (Doc. # 6), the Commissioner's Memorandum in Opposition (Doc. # 9), Plaintiff's Reply (Doc. # 10), the administrative record, and the record as a whole.

   At a minimum, Plaintiff seeks an Order remanding this case to the Social Security Administration to correct certain alleged errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 41 years old at the time of the administrative decision, and thus was considered to be a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c);[3] (*see also* Tr. 30). She has a high school education and attended technical college, earning a degree in licensed practical nursing. *See* 20 C.F.R. § 416.964(b)(3); (*see also* Tr. 107). Plaintiff has worked in the past as a Licensed Practical Nurse ["LPN"]. (Tr. 113).

Plaintiff testified at the October 9, 2008, administrative hearing that she stands five feet tall and weighs 280 pounds. (Tr. 836). She testified that her normal weight just four or five years prior to the hearing was 200 pounds. (*Id.*). She believed that she gained weight due to inactivity and eating caused by stress. (*Id.*). She stopped working because of a back injury and a kidney infection. (Tr. 839). She continued to have low back pain. (Tr. 841).

Plaintiff also testified as to her depression, noting that she became suicidal if she did not take her medication. (Tr. 848). She became angry and cried easily. (*Id.*). She tended to want to stay in the house by herself. (Tr. 849). Every two weeks, she had panic attacks that would last a couple of hours. (*Id.*). She testified that counseling makes her depression worse. (Tr. 850).

---

[3]The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding SSI/DIB Regulations.

Plaintiff testified at the February 9, 2009, administrative hearing that she still saw a pain management specialist for medication.  (Tr. 879).  She testified that everything hurt because of her fibromyalgia.  (Tr. 879, 883-84).  She also suffered from arthritis in her right knee and right hand.  (Tr. 881).  She was being treated with Lidoderm patches, but was not in physical therapy.  (*Id.*).  She could use her hands for buttoning and zipping her clothes.  (*Id.*).  Medication helped relieve her depression, but she had not been to counseling for over two years. (Tr. 881-82).  Plaintiff testified further that her low back pain was constant and of an intensity of five to six out of 10.  (Tr. 883).  The back pain went down both legs. (*Id.*).  She was most comfortable when sitting in a recliner.  (Tr. 884).  The pain stopped her from walking farther than from a parking lot to the store.  (*Id.*).

Turning to other evidence, the parties have provided detailed and informative descriptions of Plaintiff's medical records and other pertinent evidence.  (*See* Doc. #6 at 3-12; Doc. #9 at 2-8).  In light of this, and upon consideration of the complete administrative record, there is no need to fully reiterate or expand on the parties' descriptions.  Still, describing the relevant medical source opinions will help to frame further review.

Plaintiff treated with John C. Sefton, D.O., a family practice physician, from at least January 2000 to September 2008.  (Tr. 604-36, 708-13, 783-88).  During this

time period, Dr. Sefton treated Plaintiff for back, hip and knee pain, asthma, and depression. (*Id.*). Dr. Sefton referred Plaintiff to specialists, including for pain management and an orthopedist. (*Id.*).

In August 2004, Dr. Sefton reported that Plaintiff's pain appeared to be in excess of physical findings, although he acknowledged multiple trigger points. (Tr. 614). Dr. Sefton also noted that a limited range of motion in Plaintiff's lumbar spine. (*Id.*).

An MRI of the left lower extremity taken in November 2005 showed a Grade IV chondromalacia of the left knee and small bilateral knee joint effusion. (Tr. 488). Also in November 2005, a x-ray of Plaintiff's right knee showed a moderate suprapatellar effusion. (Tr. 495). An MRI of the right knee taken on December 7, 2005, showed a large joint effusion, and partial tears were suspected in the anterior and posterior cruciate ligaments, along with some mild degenerative changes in the meniscus. (Tr. 498-99). An x-ray of the right knee taken on December 14, 2005, showed early degenerative changes involving the patellofemoral and medial articular compartment. (Tr. 500).

On May 13, 2008, Dr. Sefton reported that Plaintiff had a long history of major depression, chronic low back pain, degenerative disc disease, asthma, and osteoarthritis. (Tr. 750). Dr. Sefton opined that due to Plaintiff's multiple

co-morbidities, "she is essentially unemployable." (*Id.*).  In the narrative portion of his opinion, Dr. Sefton reported feeling that "it is very unlikely that she would be able to complete a week of work without having several days where she would be late or absent for the entire day." (*Id.*).

Dr. Sefton also completed interrogatories indicating that Plaintiff would have difficulty completing a normal workday or workweek.  (Tr. 752-53).  Dr. Sefton opined that due to her degenerative disc disease, Plaintiff could lift 10 pounds occasionally.  Plaintiff also was deemed limited in her standing, walking and sitting during an eight hour workday, due to morbid obesity and an abnormal MRI.  (Tr. 754).  Dr. Sefton reported that Plaintiff never should climb, stoop, crouch, kneel or crawl.  (Tr. 755).  Dr. Sefton also reported that Plaintiff should avoid hazards in the workplace as well as environmental pollutants.  (Tr. 756).  Dr. Sefton concluded that Plaintiff would be unable to sustain even sedentary work on a regular and continuing basis.  (Tr. 758).

Plaintiff was examined by neuropsychologist Jerry Flexman, Ph.D., on April 27, 2004.  (Tr. 356-59).  Plaintiff told Dr. Flexman that she had a boyfriend, and lived with her mother and daughter.  (Tr. 356).  Plaintiff reported her daily activities as working on the computer, crafting and sewing, driving, cooking, doing dishes, cleaning, and straightening up around the house.  (Tr. 357).  She

also shopped for groceries, went to thrift stores, attended her children's activities, ate out, went to the movies, and went on dates. (*Id.*). Additionally, she babysat for a niece when needed. (*Id.*). Dr. Flexman observed that Plaintiff's attitude was passive and unvaried throughout the evaluation. (*Id.*). Dr. Flexman reported that Plaintiff's speech and affect were appropriate, she was alert and oriented, and her attention span was good. (Tr. 357-58). Her concentration and memory were good, her judgment was fair, her insight was poor, and she had no obsessional thinking, suicidal ideation, phobias, delusions, or compulsions. (Tr. 358). Plaintiff's thought processes and flow were normal. (*Id.*). However, Dr. Flexman found that Plaintiff was unable to acknowledge the presence of psychological issues in her life or lacked a realistic degree of recognition for the extent those psychological issues impaired her ability to function. Dr. Flexman also felt that somatization was present. (*Id.*). Dr. Flexman diagnosed major depression, recurrent, as well as a pain disorder associated with both general medical condition and psychological factors. Dr. Flexman also noted borderline personality traits. Dr. Flexman assigned Plaintiff a Global Assessment of Functioning ["GAF"][4] score of 55. (*Id.*). According to Dr. Flexman, Plaintiff had

---

[4]Health care clinicians perform a GAF to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. In general, it is a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and

slight difficulties in understanding, remembering and carrying out simple job instructions; making judgments for simple work-related decisions; concentration; and interacting with others.  (Tr. 359).  Dr. Flexman opined that Plaintiff  had moderate difficulty in responding to work pressures and changes in the work setting.  (*Id.*).

Plaintiff received treatment from Victor Stanchina, M.A., a licensed psychologist, and Jaseem Pasha, M.D., a psychiatrist, at Day-Mont West Focus Care from March 2005 through March 2006.  (Tr. 566-600).  Records reveal that Plaintiff received mental health treatment at that facility for major depressive disorder, bipolar disorder, and borderline personality disorder.  (*Id.*).  Day-Mont notes reveal that Plaintiff reported mood swings, a lot of time spent in insolation in unproductive activities, and a physically and verbally abusive boyfriend.  She had limited peer contact and low self esteem.  (*Id.*).  In addition, those notes reveal that Plaintiff was treated with counseling and medication.  (*Id.*).

In July 2005, Mr. Stanchina reported that Plaintiff had multiple vegetative symptoms of depression with a history of self-mutilation.  (Tr. 576-77).  He noted that Plaintiff's ability to concentrate was poor, as was her short-term memory.

---

Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

8

Mr. Stanchina opined that Plaintiff had poor ability to deal with stress and would have difficulty relating to coworkers.  (*Id.*).

Plaintiff's discharge summary indicated that due to numerous missed appointments, Plaintiff made no significant progress in treatment.  (Tr. 567).

Plaintiff was evaluated consultatively by J. William McIntosh, Ph.D., on July 21, 2005.  (Tr. 463-68).  Plaintiff was cooperative during the evaluation.  (Tr. 463).  She reported that she enjoyed working on crafts, socialized with her boyfriend, occasionally cooked, occasionally shopped, and played games with her daughter.  (Tr. 464, 466).  Dr. McIntosh noted that Plaintiff's overall mood was mildly depressed and her affect changed during the evaluation.  No outward signs of anxiety were observed.  (Tr. 464).  She was oriented, her memory was intact, her speech was normal, and she had no flight of ideas or looseness of association.  Dr. McIntosh also noted that Plaintiff responded in a logical and relevant way.  (Tr. 465).  She denied auditory and visual hallucinations.  Her insight was noted to be limited and her judgment impaired.  (Tr. 465-66).  On mental status examination, Plaintiff recalled two objects out of three after five minutes.  Dr. McIntosh diagnosed a dysthymic disorder, late onset, mild, and a borderline personality disorder.  He assigned a GAF of 55.  (Tr. 466).  According to Dr. McIntosh, Plaintiff's ability to understand, remember and carry out one- or

9

two-step job instructions and to withstand the stress and pressures of work were mildly impaired, and her ability to interact with others was mildly to moderately impaired.  Dr. McIntosh concluded that Plaintiff could perform simple, repetitive tasks.  (Tr. 467).

Based on the opinions of state agency reviewing psychologist Alice L. Chambly, Psy. D., who reviewed the record on May 11, 2004 (Tr. 373-88), and Tonnie Hoyle, Psy. D., who reviewed the record on August 2, 2005 (Tr. 469-86), the ALJ further restricted Plaintiff to performing work with low demands on her ability to concentrate on a single task for longer than 15 minutes at a time; and to no exposure to the general public.  (*See* Tr. 28).  The state agency psychologists found that Plaintiff would be able to perform at least one- to three-step directions; tasks that did not require independent prioritization or more than daily planning; and work that did not require more than occasional interactions with others.  (Tr. 388, 485).

Plaintiff also relies on the opinion of treating psychiatrist Mahmood Rahman, M.D.  Dr. Rahman treated Plaintiff at Advanced Therapeutic Services from March 2007 through December 2008.  (Tr. 678-88, 693-84, 734-37, 759-72, 813-16).  Initially, Plaintiff's mood was tearful and her affect expressive.  (Tr. 688). She was diagnosed with a major depressive disorder, recurrent, with moderate

10

and borderline traits noted. She was referred for individual outpatient therapy as well as psychiatric care. (Tr. 687). When first seen by Dr. Rahman, Plaintiff he also was diagnosed with an anxiety disorder and assigned a GAF of 55. She was placed on medications including Klonopin, Wellbutrin, and Lexapro. (Tr. 685).

Dr. Rahman's treatment notes reveal that he saw Plaintiff for 20 to 30 minutes a month, primarily to monitor her medication. His progress notes show that Plaintiff's symptoms improved with treatment and that she had no medication side effects. (Tr. 678-88, 693-84, 734-37, 759-72, 813-16).

On April 28, 2008, Dr. Rahman reported that Plaintiff had poor or no ability to relate to coworkers and the public; deal with work stresses; maintain attention and concentration (Tr. 747); understand, remember and carry out detailed or complex instructions (Tr. 748); behave in an emotionally stable manner; or demonstrate reliability. (Tr. 749). Plaintiff had fair ability to understand, remember, and carry out simple job instructions (Tr. 748); interact with supervisors; work independently; and relate predictably in social situations. (Tr. 749).

Plaintiff also relies on the opinion of Aivars Vitols, D.O., who examined Plaintiff on November 6, 2008. (Tr. 789-803). Dr. Vitols observed that Plaintiff

was 5 feet tall and weighed 290 pounds. (Tr. 791). He reported his examination

findings as follows:

> The claimant presents with a very slow and deliberate
> gait. Claimant is utilizing a walker for assistive
> ambulation. Claimant is unsteady at station.
>
> With back to examiner, shoulders are of equal height
> and there is no gross scoliosis. Cervical spine reveals
> full range of motion. There is no palpable myospasm,
> right or left.
>
> Tenderness is identified in multiple symmetrical points
> during the examination. Suboccipital triangles are
> tender, right and left. Upper dorsal segments are
> tender, right and left. Medial borders of the scapulas
> are tender, right and left, as well as the mid-dorsal
> spine. The anterior and posterior acromion areas of the
> shoulders are tender symmetrically. Both elbows are
> reported with tenderness both medial and lateral
> epicondylar areas. Wrist tenderness is reported
> generalized medially and laterally. Both iliac crests are
> tender to palpation, right and left laterally. SI joints are
> also reported tender. Both trochanteric areas are
> symmetrically tender to palpation. Both knees reveal
> global tenderness to palpation, as do both of the ankles.
> Mid-axillary line is tender to palpation over the chest
> cage, right and left.
>
> Neither shoulder reveals any deltoid flattening. Both
> shoulders reveal painfully restricted active range of
> motion as documented on the motion sheet. Passively,
> shoulder motion is unrestricted, but reported with pain
> and discomfort. There is no crepitus, no muscle spasms
> and no instabilities of either shoulder.

Both elbows have full flexion and extension and no instabilities. Both forearms have unrestricted pronation and supination. Both wrists are stable with unrestricted motion. Tinel's is negative at both volar carpal tunnels. Finkelstein and Watson tests are negative, right and left. Radial pulses are strong and equal. Biceps, triceps and forearm reflexes are +2, right and left.

There is no evidence of atrophy of the upper extremities. Claimant is able to grasp and manipulate with both hands satisfactorily. Pinch and grip are weak, but equal. There is no intrinsic atrophy of either hand.

Claimant has virtually no ability to bend the spine. She reports pain and discomfort with any movement, as well as being unsteady at station. Claimant is unable to perform heel-to-toe walking satisfactorily.

With claimant seated on the examining table, hip motion is painful, but unrestricted, right and left. Faber Patrick and straight-leg raising are negative, right and left.

Both knees reveal restricted flexion due to exogenous obesity. Medial and lateral joint line tenderness is present of both knees. There is patellofemoral crepitus through the flexion arc. Both knees reveal more pain medially than laterally to palpation. There is no evidence of ligamentous instabilities. Homans is negative of bath calves.

Both ankles are stable with unrestricted motion. There is +2-pretibial edema, right and left. No skin changes are identified of either lower extremity. EHL strengths are intact. Patella and Achilles' reflexes are +1 and equal.

13

(Tr. 792).  "Based on the clinical objective findings of this examination," Dr. Vitols concluded that "the claimant would have difficulty carrying on any type of regular work-related activities requiring physical exertion." (Tr. 793). Specifically, Dr. Vitols opined that Plaintiff should not perform any lifting.  (Tr. 798).  Plaintiff could not sit, stand, or walk for more than 30 minutes at a time and could not sit for more than four hours in an eight-hour workday, or stand/walk for more than two hours each in an eight-hour day.  Dr. Vitols noted that Plaintiff never should climb, balance, stoop, kneel, crouch, or crawl; never could work at unprotected heights or around moving machinery; never could operate a motor vehicle; and never could work around vibration.  (Tr. 799-802).

The Commissioner, conversely, urges that the ALJ reasonably relied on the testimony of a medical expert witness, Richard Hutson, M.D. (*see* Doc. #9 at 14-15), to whose opinion the ALJ gave "greater weight."  (*See* Tr. 30).  Testifying at the second administrative hearing on February 9, 2009 (*see* Tr. 891-97), Dr. Hutson opined that Plaintiff did not meet or equal the listings.  (Tr. 894).  His review of the record revealed that Plaintiff suffered from knee osteoarthritis worse on the left than the right, with normal hand x-rays and lumbar spine x-rays and MRIs.  (Tr. 892-93).  Dr. Hutson testified that some tender points

14

suggested fibromyalgia syndrome, but Plaintiff did not have 11 of 18 tender points required, and the record has not shown this consistently.  (Tr. 893).

Based on his review of the evidence, Dr. Hutson opined that Plaintiff was limited to work at the sedentary exertion level.  (Tr. 894).  He indicated that Plaintiff was limited to lifting five pounds frequently and 10 pounds occasionally.  (*Id.*).  Plaintiff would need to be allowed to stand up at her workstation up to five minutes out of every hour.  (*Id.*).  Plaintiff could perform postural activities occasionally, except that she never should climb ladders, ropes, or scaffolds; or kneel, crouch, or crawl.  (Tr. 895).  Dr. Hutson further testified Plaintiff should avoid environmental irritants and hazards.

When examined by Plaintiff's counsel, Dr. Hutson disagreed with Dr. Vitols' opinion that Plaintiff could perform no postural activities, as Dr. Hutson found no support in the record for that assessment.  (Tr. 895).  Dr. Hutson also did not agree with Dr. Vitols' lifting and carrying limitations, because Plaintiff testified that she can lift a gallon of milk.  (Tr. 896).  Dr. Hutson testified that stooping can be done by locking the spine into extension, as when a person bends backward at the waist, and a person then can flex or bend forward at the hips safely up to 45 degrees.  (*Id.*).  For that reason, he did not agree with Dr. Vitols' assessment that Plaintiff has virtually no ability to bend at the spine.  (*Id.*).

15

Dr. Hutson also disagreed with Dr. Sefton's opinion that Plaintiff could stand or walk less than an hour for a total of 30 minutes at a time. (Tr. 896). He noted that Dr. Sefton pointed to MRI findings, but "[w]e don't treat MRIs." (*Id.*).

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

### A.  <u>Applicable Standards</u>

To be eligible for SSI or DIB, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See id.* A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 19-20); 20

C.F.R. § 416.920(a)(4).  Although a dispositive finding at any Step terminates the

ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully

considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff has not

engaged in substantial gainful activity since October 5, 2003, her alleged onset

date, and continued to meet the disability insured-status requirements through December 31, 2008. (Tr. 23).

The ALJ found at Step 2 that Plaintiff has the severe impairments of osteoarthritis of both knees; chronic low back pain attributed to a sprain or strain; obesity; and depression. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (Tr. 26).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of sedentary work with the following restrictions: lifting no more than 10 pounds; alternate sitting and standing as needed; standing and/or walking no more than two hours of an eight-hour work day; use of a walker to ambulate; occasional reaching above shoulder level; occasional use of foot controls; no kneeling, crouching, or crawling; occasional pushing or pulling; occasional climbing of stairs; no climbing of ropes, ladders, or scaffolds; no exposure to temperature extremes or humidity; no exposure to hazards or vibrations. Plaintiff must not be required to maintain concentration on a single task for longer than 15 minutes at a time. She also is to have no exposure to the general public. (Tr. 27-28).

The ALJ next found that Plaintiff could not perform her past relevant work as an LPN, but was capable of performing other jobs in the national economy. (Tr. 30-31).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for SSI or DIB.  (Tr. 18-32).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

19

Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    The Parties' Contentions

In her first allegation of error, Plaintiff argues that she "is physically more limited than found by the ALJ." (Doc. # 6 at 14). Specifically, she urges that the ALJ's RFC finding "did not go far enough" in considering how her obesity would affect her ability to function in a work environment. (*Id.*). She also contends the ALJ erred in rejecting the opinions of her treating physician, Dr. Sefton; her examining physician, Dr. Vitols; and her treating psychiatrist, Dr. Rahman; and

20

in relying instead on the opinion of the non-examining medical expert, Dr.

Hutson. (*Id.* at 15-16, 18). In her second allegation of error, Plaintiff contends

that she is more limited in her ability to perform the mental demands of work

than found by the ALJ, and that the ALJ erred by failing to acknowledge or

evaluate the opinion of a treating psychologist, Victor Stanchina. (*Id.* at 17). She

urges that the ALJ's errors in these regards mandate a reversal of the ALJ's

decision. (*Id.* at 20).

The Commissioner contends that substantial evidence supports the ALJ's

decision that Plaintiff was not disabled because she could perform a significant

number of jobs. (Doc. # 9 at 11). Defendant argues that the ALJ reasonably

decided to give "little weight" to the opinions of Drs. Sefton, Vitols, and Rahman,

and reasonably concluded Plaintiff had the RFC to perform a reduced range of

sedentary work. According to Defendant, the ALJ was not required to grant

significant weight to these opinions because they were unsupported by objective

medical findings, treatment notes, and Plaintiff's activities. (*Id.* at 11-14, 17-18).

Asserting that Mr. Stanchina's opinion is "patently deficient," Defendant also

urges that the ALJ's failure to mention that opinion is harmless error. (*Id.* at 16).

Finally, according to Defendant, the ALJ provided good reasons for relying on

the opinion of Dr. Hutson. (*Id.* at 14).

21

### B.    <u>Medical Source Opinions</u>

#### 1.    <u>*Treating Medical Sources*</u>

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist, or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544.  A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *Blakley,* 581 F.3d at 406; *Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Id.* (citing *Wilson*, 378 F.3d at 544).  More weight generally is given to the opinions of examining medical sources than to those of non-examining medical sources.  *See* 20 C.F.R. § 416.927(d)(1).  Yet the opinions of non-examining state agency medical

22

consultants have some value, and under some circumstances can be given

significant weight.  This occurs because the Commissioner views such medical

sources "as highly qualified physicians and psychologists who are experts in the

evaluation of the medical issues in disability claims under the [Social Security]

Act."  Social Security Ruling ["SSR"] 96-6p.  Consequently, opinions of one-time

examining physicians and record-reviewing physicians are weighed under the

same factors as treating physicians' opinions, including supportability,

consistency, and specialization.  *See* 20 C.F.R. 20 C.F.R. § 416.972(d), (f); *see also*

SSR 96-6p at *2-*3.

### 2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  SSR 96-6p, 1996 WL

374180, at *2.  Yet the Regulations do not permit an ALJ to automatically accept

(or reject) the opinions of a non-treating medical source.  *See id*. at *2-*3.  The

Regulations explain, "In deciding whether you are disabled, we will always

consider the medical opinions in your case record together with the rest of the

relevant evidence we receive."  20 C.F.R. §416.927(b).  To fulfill this promise, the

Regulations require ALJs to evaluate non-treating medical source opinions under

23

the factors set forth in §416.927(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §416.972(f); *see also* SSR 96-6p, 1196 WL 374180, at **2-3.

### C.    Analysis

Plaintiff complains that the ALJ's decision does not contain a discussion of her obesity and how it would affect her RFC and her ability to function in a work environment.  (Doc. #6 at 14).  The Administration's policy and protocol on the evaluation of obesity is explained at SSR 02-1p, 2000 WL 628049 (Sept. 12, 2002). "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat."  *Id.* at *2.  That Ruling recognizes Body Mass Index ["BMI"] as one indicia of an individual's degree of obesity.  *Id.*.  BMIs of 30.0-34.9 (Level I), 35.0-39.9 (Level II), and over 40 (Level III) represent the three recognized degrees of obesity.  *Id.*  Under this system of classification, Level III is termed "extreme" obesity, with "the greatest risk for developing obesity-related impairments."  *Id.* Obesity increases the potential for problems such as osteoarthritis, and may contribute to mental impairments such as depression.  *Id.* at *3.

SSR 02-1p provides that at Step two of the five-step evaluation, obesity may be considered severe alone or in combination with another medically determinable impairment.  *Id.* at *4.  It further provides for "an individualized

24

assessment of the impact of obesity on an individual's functioning when deciding

whether the impairment is severe."  SSR 02-1p[6].  SSR 02-1p also explains that a

claimant's obesity must be considered not only at Step two of the five-step

evaluation process, but also at subsequent steps.  The Ruling states as follows:

> The effects of obesity may not be obvious.  For example,
> some people with obesity also have sleep apnea[,
> which] can lead to drowsiness and lack of mental clarity
> during the day. . .
>
> An assessment should also be made of the effect obesity
> has upon the individual's ability to perform routine
> movement and necessary physical activity within the
> work environment.  Individuals with obesity may have
> problems with the ability to sustain a function over
> time. . .  [O]ur RFC assessments must consider an
> individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on
> a regular and continuing basis. . .  In cases involving
> obesity, fatigue may affect the individual's physical and
> mental ability to sustain work activity.  This may be
> particularly true in cases involving sleep apnea.
>
> The combined effects of obesity with other impairments
> may be greater than might be expected without obesity.
> For example, someone with obesity and arthritis
> affecting a weight-bearing joint may have more pain
> and limitation than might be expected from arthritis
> alone.

SSR 02-1p[8]; *see also* 20 C.F.R. § 416.923 (explaining that if the Administration

finds "a medically severe combination of impairments, the combined impact of

the impairments will be considered throughout the disability determination

process"). In sum, SSR 02-1p "specifies that the ALJ must explain how conclusions regarding a claimant's obesity were reached." *Fleming v. Barnhart*, 284 F. Supp.2d 256, 271 (D. Md. 2003). SSR 02-1p's provisions are binding. *See* 20 C.F.R. § 402.35(b)(1).

An adjudicator must consider the impact of a claimant's obesity on her RFC. At Step five of the five-step sequential analysis, the burden shifts to the Administration to show that other jobs exist in significant numbers in the economy that the claimant can perform consistent with her RFC, age, education, and work experience. *See Wilson*, 378 F.3d at 548; 20 C.F.R. § 404.1520(a)(4)(v). When a claimant is obese, the ALJ must consider this in his assessment. SSR 02-1p; *see Young v. Barnhart*, 282 F. Supp.2d 890, 897-98 (N.D. Ill. 2003).

Here, the ALJ's opinion did not assess Plaintiff's obesity in the manner contemplated by SSR 02-1p, especially with respect to its effect in combination with her other impairments. ALJ McNichols did discuss obesity at Step two of his sequential evaluation, but rejected the opinions of treating physician Dr. Sefton and examining physician Dr. Vitols, both of whom opined that obesity affected Plaintiff's ability to engage in work activity at all levels of exertion. Although he did find "obesity" to be among Plaintiff's severe physical impairments (Tr. 23), the ALJ's analysis relative to that condition essentially

26

ended there.  Instead of fully exploring in the later Steps of his sequential evaluation the additional and cumulative effects of obesity on Plaintiff's overall functioning, the ALJ simply chose to add "[r]estrictions on kneeling, crouching, and crawling . . . because of the effect of [Plaintiff's] obesity on her mobility."  (Tr. 29).  For example, the ALJ failed to discuss Plaintiff's obesity at Step three of the sequential evaluation process when determining whether Plaintiff's impairment or combination of impairments meets or medically equals the criteria of an impairment for purposes of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*See* Tr. 26-27).  He also failed to discuss Plaintiff's obesity at Step four of the sequential evaluation process when determining Plaintiff's RFC.  (*See* Tr. 28-30).

Additionally, the ALJ failed to consider the effects of Plaintiff's obesity on her other medical impairments.  As SSR 02-1P[8] explicitly recognizes, "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  2000 WL 628049, at *6.  Despite that admonition, ALJ McNichols never addressed the prospect that Plaintiff's excess weight might intensify the residual effects she experienced as a result of her joint and muscle knee pain caused by osteoarthritis.  Plaintiff also testified that she experienced tiredness (*see* Tr. 864), yet the ALJ never directly addressed that symptom, despite SSR 02-1p[8]'s specific acknowledgment that

obesity can cause fatigue that "may affect the individual's physical and mental ability to sustain work activity."  *See id.*  Such considerations would be relevant both in determining whether Plaintiff's impairments met or medically equaled an impairment set forth in the Listings, and in determining Plaintiff's RFC.

As the Commissioner implicitly concedes, the ALJ relied heavily on the opinion of testifying expert Dr. Hutson as support for his RFC conclusions.  (*See* Doc. #9 at 14; Tr. 28).  Plaintiff asserts – without challenge from Defendant – that Dr. Hutson "ma[de] no mention of [Plaintiff's] obesity."  (Doc. #6 at 16; *see* Doc. #9 at 14).  A review of Dr. Hutson's testimony confirms that the medical expert there focused on the results of x-rays, MRIs and other objective medical tests performed on Plaintiff, without ever referring to her additional weight issue.  (*See* Tr. 891-95).  By way of response, Defendant suggests that because Dr. Hutson reviewed medical records documenting Plaintiff's obesity and heard her testify, he must have taken that condition into consideration.  (Doc. #9 at 14).

At least one court has held that any error was harmless where an ALJ failed to address a claimant's obesity but "specifically predicated his decision upon the opinions of physicians who did discuss her weight."  *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).  That, however, is not the situation now before this Court.  Neither Dr.  Hutson's testimony nor ALJ McNichols' decision

discloses how much weight, if any, either of them placed on the combined effects of Plaintiff's obesity with her other impairments when assessing her RFC. Moreover, other medical evidence of record in this case did indicate that the effect of Plaintiff's other impairments on her overall level of functioning was compounded by her obesity. (*See, e.g.,* Tr. 752, 754, 793); *but cf. Prochaska*, 454 F.3d at 737 (where claimant "fail[ed] to point to any other evidence suggesting that her obesity exacerbated her physical impairments."); *see also Brown v. Astrue*, No. 2:09-cv-1011, 2010 WL 3069350, at *2 (S.D. Ohio Aug. 4, 2010) (Smith, J.) (remanding for ALJ to "review the evidence concerning obesity and articulate [how] that was taken into account, as required by SSR 02-1p"). In light of such evidence, failure to address the effect of Plaintiff's obesity when combined with her other conditions was not harmless error.

Because the ALJ's opinion never refers to SSR 02-1p or its guidelines for evaluating obesity, the Court cannot determine whether the ALJ's decision complies with the Act, Regulations and SSR 02-1p. Given the Court's conclusion that the ALJ's decision should be reversed for failure to properly consider Plaintiff's obesity consistent with SSR 02-1p, the Court need not address Plaintiff's remaining arguments.

## VI. REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual

conclusions are not supported by substantial evidence, the Court must decide

whether to remand the case for rehearing or to reverse and order an award of

benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to

affirm, modify, or reverse the Commissioner's decision "with or without

remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).

Remand is appropriate if the Commissioner applied an erroneous principle of

law, failed to consider certain evidence, failed to consider the combined effect of

impairments, or failed to make a credibility finding. *Faucher v. Sec'y of*

*Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming, and the evidence of disability also is

not strong while contrary evidence is weak. *See id.* Instead, Plaintiff is entitled to

an Order remanding this case to the Social Security Administration pursuant to

Sentence Four of § 405(g) due to the problems discussed *supra*. On remand, the

ALJ should be directed to (1) evaluate the impact of Plaintiff's obesity under the

guidelines of SSR 02-1p; (2) evaluate the evidence of record, including the

medical source opinions, under the applicable legal criteria as mandated by the

Commissioner's Regulation and Rulings and by case law; and (3) evaluate

30

Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for SSI or DIB should be granted.

### IT THEREFORE IS RECOMMENDED THAT:

1. The ALJ's decision be VACATED;

2. No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act;

3. This matter be REMANDED to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations and any decision adopting this Report and Recommendations; and

4. The case be TERMINATED on the docket of this Court.

May 2, 2011                                      s/Sharon L. Ovington
                                              Sharon L. Ovington
                                              United States Magistrate Judge

31

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).